---

## In re BERG.

(District Court, D. Massachusetts. November 7, 1910.)

### No. 16,176.

1. BANKRUPTCY (§ 140*)—RECLAMATION OF GOODS—FRAUDULENT PURCHASE—BURDEN OF PROOF.

In proceedings by a seller of goods to a bankrupt to reclaim the same, on the ground that the bankrupt had obtained them by false and fraudulent representations with reference to his financial condition, knowing himself at the time to be insolvent, and intending not to pay for them, petitioner must not only show that the bankrupt had knowledge of his financial condition at the time he purchased the goods, but that he had no reasonable expectation of being able to pay for them.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

2. BANKRUPTCY (§ 303*)—SALE OF GOODS TO BANKRUPT—RESCISSION—FRAUD—EVIDENCE.

In a proceeding to recover goods sold to a bankrupt from his trustee, on the ground that they had been purchased on credit by means of fraudulent representations as to the bankrupt's financial ability, evidence held insufficient to require the vacation of a referee's finding that the credit was not extended solely upon the bankrupt's representations as to his financial ability, and that at the time of the sale the bankrupt was not

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in such a condition that he had no reasonable expectation of being able to pay for the goods.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.*]

In Bankruptcy. In the matter of bankruptcy proceedings of Isaac Berg. On petition of the Ohio Motor Company to review a referee's order denying its petition for reclamation of certain property from the trustee as obtained by false and fraudulent representation as to the bankrupt's financial condition. Referee's order affirmed.

Phipps, Durgin & Cook, for trustee.

Spaulding & Lewis, for petitioner.

DODGE, District Judge. This bankrupt did business in Boston under the name of Boston Constructing Company. There was really no company, and he was the sole person interested. The business was that of dealing in machinery. Adjudged bankrupt July 18, 1910, upon the involuntary petition in these proceedings, he has scheduled liabilities of $18,274.67 and assets of $5,115, in all. The petitioner, Ohio Motor Company, manufactures gas and gasoline engines at Sandusky, Ohio. The merchandise it seeks to reclaim is stated in its petition to consist of:

One engine, shipped to the bankrupt March 10, 1909, invoiced at $119.

One engine, shipped July 23, 1909, damaged, originally worth $127.

Two engines, shipped September 14, 1909, invoiced respectively at $227 and $339.

Six engines and a number of parts and appliances, shipped May 17, 1910; total invoice price, $1,410.70.

It is not disputed that all of the above were in the trustee's hands when the petition to reclaim was filed on August 15, 1910.

The four engines shipped in March, July, and September, 1909, appear by the evidence to have been paid for, at least in part. For the remaining goods named in the petition the petitioner has not been paid. It offers to surrender certain acceptances and notes given in payment for them.

The petitioner bases its claim to the goods upon allegations that the bankrupt obtained them by means of false and fraudulent representations in regard to his financial condition, knowing himself to be insolvent, and not intending to pay for them.

It relies in the first place upon a written statement of his financial condition, signed by him and given to it in Sandusky December 16, 1908. The statement recites that it is made for the purpose of obtaining credit on the purchase of engines and supplies. It represents the value of his stock in trade as $6,000, good notes and accounts $3,000, total assets $9,000, liabilities $2,500, and net worth $6,500, not including tools and fixtures worth $1,000. This statement was made before there had been any dealings between the petitioner and the bankrupt, and when he was seeking to induce them to ship merchandise to him on credit. I find no proof that the bankrupt was insolvent at the time and none that his statement, as it stands, was not then sub-

stantially true, as the referee has found it to be. The written statement contains nothing to show the nature of the liabilities said to amount to $2,500. The petitioner's evidence is that he stated orally at the time that it did not include any outstanding notes, but was all due for merchandise, and that this statement was not true, there being at the time certain outstanding notes, representing $225 lent to him by one Carter, upon which he was liable as indorser, and a further indebtedness to Carter for money loaned of $300. The notes, however, did not become due until February, 1909. The bankrupt made up the statement, not from his books in Boston, but from recollection at Sandusky, and he testified that he stated it to be only approximate. I do not think I am justified on the evidence in overruling the referee's finding, or in finding that all the petitioner's subsequent shipments were induced by fraud in connection with this statement.

A series of shipments by the petitioner to the bankrupt followed in 1909, and 1910, the last one being the shipment of May 17, 1910. With the exceptions already stated, the bankrupt paid for everything thus sold him on credit, and paid the petitioner in all between $10,000 and $11,000. In June, 1909, being then in arrears to the petitioner for goods shipped, he asked that the amount of $2,500, first agreed on as the limit of his credit, be extended. The petitioner extended it without any further inquiry, so far as appears, as to his then financial condition. In October, 1909, the bankrupt being still in arrears, a representative of the petitioner came to Boston, complained to him of his want of promptness in paying, and got from him a check for $1,200. The bankrupt later requested by telegraph that this check be held for one week, which was done. The petitioner's evidence is that at the time of giving the check the bankrupt stated, in reply to inquiries, that his financial condition had not changed much since his statement of December, 1908, but was better. In point of fact it was far worse. He was then owing $10,000 to $12,000, and had only $5,000 to $6,000 worth of assets, as the referee has found. The bankrupt denies that he stated his financial condition to be better than in December, 1908, and says that he stated only that he was not flush with money, that business was dull, that these were the reasons for his delay in paying, and that he had no money in the bank. Whether the bankrupt's or the petitioner's account of what was said at this interview is the true one the referee has not found, but he has found that the bankrupt did not know his actual financial condition at the time. If he really represented himself as better off in October, 1909, than in December, 1908, it would make little difference whether he actually knew his own financial condition or not. Of course, he must be held to know what he undertook to represent; but, granting the alleged false representations in October to have been made, I do not think it proved that they induced the shipment of the merchandise in question. The shipments in March, July, and September, 1909, had been already made in October, and as to the only remaining shipment it was not made until after six months more had expired, during which there were further dealings and correspondence between the parties. The petitioner wrote the bankrupt Janu-

ary 10, 1910, a letter from which it appears· that he had then failed to take care of a note or acceptance, given for merchandise shipped, when it became due, and that he had been presenting excuses for the failure. When, on April 13, 1910, he ordered the engines composing the last shipment, the bankrupt sent a letter stating that he already had orders for three of the engines and expected to have all sold when they arrived. The petitioner hesitated to make the shipment because of the bankrupt's failure to meet his note, and did not make it until May 17th, after getting a report regarding him from a commercial agency. His failure to make prompt payments before October, 1909, has already been referred to, and the petitioner also knew before that time that he was borrowing money from Carter to enable him to keep on. In view of all the circumstances attending the shipment, the conclusion seems to me reasonable that the petitioner was induced to make it, quite as much by the bankrupt's success in selling engines and the expectation that he would be able to sell all these engines without delay, as by any of the representations testified to regarding his financial condition, whether made by him in December, 1908, or in October, 1909.

Undoubtedly the bankrupt ought to have known his own financial condition, and for many purposes would have to be regarded as charged with knowledge of it; but the petitioner in this case must show that when he ordered the goods the bankrupt had no reasonable expectation of being able to pay for them. I do not think the evidence in this case requires me to overrule the conclusion of the referee that the bankrupt was not in that condition at the time here in question. There is uncontradicted evidence that down to the time of his failure he had expectations of financial assistance from various sources, and no evidence that these expectations were unreasonable. Notwithstanding any excess of his liabilities over his assets, he had been able for a considerable time to carry on business with some success, and, so far as appears, he may not unreasonably have expected to be able to do so long enough, at least, to pay for this merchandise.

The order of the referee is approved and affirmed.