### CITY OF SOUTHPORT v. WILLIAMS et al.

(District Court, E. D. North Carolina. June 2, 1923.)

1. **Municipal corporations ⨺921(1)—Evidence held to show officer of insolvent bank acquired possession of municipal bonds without intention to pay for them.**

Undisputed evidence that municipal bonds were bought by a savings bank, which was then insolvent, and certificates of deposit payable in 3 and 12 months given therefor, and that immediately on receipt of the bonds the purchasing bank deposited them with a national bank having the same president, which was also then insolvent and under examination by a bank examiner, in order to wipe out an overdraft of the savings bank with the national bank, and that the bonds were sent by the national bank to another with draft attached, drawn upon another bidder for the bonds, with whom the bank had no agreement for their sale, shows that the bonds were purchased by the savings bank without intention to pay for them, and for the purpose of using them to support the credit of the national bank in the examination.

**2. Banks and banking ⬤═262—Bank chargeable with president's knowledge as to equities against securities transferred from another bank, of which he was also president.**

Where the president of a national bank was also president of a state savings bank, and acted for the latter in purchasing municipal bonds without any intention to pay for them, but for the purpose, which he carried out, of depositing them to the credit of the savings bank in the national bank, and thereby meeting an overdraft of the savings bank and supporting the credit of the national bank, the national bank is charged with knowledge of the transaction, and cannot claim to be a bona fide purchaser of the bonds.

**3. Municipal corporations ⬤═921(1)—Delay held not to estop city from rescinding sale of bonds.**

A delay of 6 weeks by a city in bringing suit against two banks to recover bonds purchased by one of the banks from the city, without intention to pay for them, during practically all of which time the purchasing bank had been receiving deposits and paying checks, but had made no statements showing its possession of the bonds on which any depositor had relied, and in fact was not in possession of the bonds, but had parted with them immediately after receiving them, does not estop the city from rescinding the contract and recovering the purchase of the bonds.

**4. Sales ⬤═45, 316(1)—Seller can rescind, if buyer had no intention of paying for goods.**

A seller can rescind a sale and recover possession of the goods, if the buyer knew it was hopelessly insolvent at the time of purchase, and purchased without any intention of ever paying for the goods.

In Equity. Suit by the City of Southport against C. L. Williams, receiver of the Commercial National Bank of Wilmington, N. C., and others, to recover possession of municipal bonds, in which J. W. Little, as receiver of the Liberty Bank of Wilmington, N. C., intervened and asserted a claim to the bonds. Decree rendered, directing return of the bonds to complainant.

R. W. Davis, of Southport, N. C., and E. K. Bryan, of Wilmington, N. C., for plaintiff.

H. E. Rodgers, of Wilmington, N. C., and Irvin B. Tucker, U. S. Atty., of Whiteville, N. C., for defendant Williams.

Ruark & Campbell, of Wilmington, N. C., for defendant Little.

Rountree & Carr, of Wilmington, N. C., for defendants Underwood and Brooks.

Herbert McClammy, of Wilmington, N. C., for defendant Cooper.

CONNOR, District Judge. The bill, answers, and evidence disclose the following case:

The city of Southport, N. C., is a municipal corporation, having the powers conferred upon cities and towns, and authority, by compliance with the provisions of its charter and the statutes of North Carolina, to issue bonds for the purpose of constructing waterworks, sewerage, and other necessary public utilities. Pursuant to the provisions of the Municipal Finance Act (Consol. Statutes, § 2950; Pub. Acts Extra Session, 1921, chapter 106, § 1), an issue of municipal bonds, to the amount of $40,000, for the purpose of providing funds to construct a system of waterworks and sewerage, was made by the

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

board of commissioners of Southport. Following an advertisement, inviting bids for the bonds, a meeting of the board of aldermen was held on December 21st, at which, a majority of the members of the board being present, Thomas E. Cooper, president of the Liberty Bank of Wilmington, submitted a bid for said bonds, by letter, as follows:

"Wilmington, December 20, 1922.

"Mr. T. B. Carr, Mayor, City of Southport, Southport, N. C.—Dear Sir: This confirms our verbal agreement with reference to the purchase of $40,000 5½ per cent city of Southport bonds. We are to take the bonds and pay you par, with accrued interest, with the understanding that the funds will be left with us, without interest, up to March 1, 1923, and at that time you will be at liberty to·check whatever amounts are needed to pay city of Southport bills, subject to the balance not being reduced to an amount less than $15,000. The $15,000 in question is to be left with us, not subject to check, for a period of 12 months, without interest. We believe the above covers the agreement, and, if this is correct, we will thank you to kindly acknowledge receipt and confirm the above agreement.

"Very truly yours,    Thomas E. Cooper, President."

Alderman Thompson not being present, the mayor stated that Thompson had phoned him that the Murchison National Bank had the offer of a New York bond buyer to submit, and that Caldwell & Co., of Birmingham, had indicated that they wished to submit an offer by wire. For the purpose of having full information and obtaining as much as possible for the bonds, the board took a recess until Friday, December 22d, at which time the bids made by Cooper and Prudden & Co. on December 21st, being the only bids made, were rejected. Caldwell & Co. submitted a bill for the bonds at par, with accrued interest, and a premium of $50. Thomas E. Cooper was notified, over the phone, of this bid, whereupon he phoned to the mayor, "in substitution of offer heretofore rejected," an offer for "said bonds for the Liberty Bank at par, 5½ per cent. accrued interest, with a premium of $60." This offer was accepted by the board. Mayor Thomas B. Carr and the clerk were ordered "to execute and deliver said bonds on payment of purchase price, to wit, $40,000, accrued interest at 5½ per cent, and $60 premium." The following order was thereupon made and entered on the minutes of the board:

"It having been made to appear that the improvement for which the said bonds were issued is being carried on in a satisfactory manner, and that payment for said improvements will not be required until same is completed, and it being made to appear that $25,000 will be required not earlier than March 1, 1923, and that the remaining $15,000 will not be necessary to be used earlier than 10 months thereafter, C. L. Bell made [a] motion that the said $40,000 be deposited in the Liberty Savings Bank, Wilmington, N. C., to be checked out as follows, to wit: $25,000 not earlier than March 1, 1923, and that the remaining $15,000 be checked out on said bank after the expiration of 10 months thereafter, and that the Liberty Savings Bank be required to execute a good, solvent bond of $40,000, same to be approved by the city attorney, Mayor T. B. Carr, J. W. Thompson, and C. L. Bell."

The mayor and treasurer were authorized to execute and deliver the bonds to the Liberty Bank upon its compliance with its bid and the resolution adopted by the board. On December 28, 1923, the

committee, and the mayor, clerk, treasurer, and city attorney met in the city hall in Southport. J. C. Rourk, cashier of the Liberty Savings Bank, was present, "presumably to close up this deal." He was asked "if he had the money to pay for the bonds." The city attorney told him that he must have the cash or its equivalent. He said he "didn't have either, but would get in touch with Mr. Cooper, and get the money or its equivalent down on the boat next day."

The committee adjourned to the next day, December 29th, at 1 o'clock. Rourk was present and said he was "ready to close up the deal" ; said he could give checks. He had blank checks on the Commercial Bank, and was prepared to give certificates of deposit for the checks, when indorsed to the Liberty Bank. He had three blank checks on the Commercial Bank, which he proceeded to fill out—one for $40,000, and one for $134 and some odd cents for accrued interest, and one for $60. The city treasurer, by direction of Rourk, indorsed the checks for deposit to the credit of the city of Southport in the Liberty Savings Bank of Wilmington, whereupon Rourk issued two certificates of deposit, one for $25,000, and one for $15,000, payable to the city of Southport, without interest. The bonds were thereupon delivered to Rourk. This was about 2:15 o'clock p. m. He left Southport on the boat at 2:30, taking the bonds and the checks which he had given, for deposit, and returned to Wilmington. It takes "around two hours and a half" for the boat to reach Wilmington. The committee accepted the bond, signed by defendants Cooper, Rourk, Underwood, and Brooks. Before the bonds were delivered, the city attorney asked Rourk in regard to the condition of the Liberty Savings Bank. He said: "It was all right; good; doing fine."

Rourk requested that the opinion of an attorney be asked, by wire, as to the validity of the bonds. The city attorney said that was his business; he would attend to it. Rourk was asked, before the transaction was closed, if he could not wait until the next day, because Mr. Thompson, a member of the committee appointed to approve the bond, was out of town. He said he could not possibly do it, because—

"Mr. Cooper had to go to Raleigh that night, and there would be nobody left in the Liberty Bank, but a lady. He said they had sold, or engaged, these bonds to the members of the Christmas Club."

On the night of December 22d, while the board of aldermen was in session, the city attorney called Thomas E. Cooper, president of the Liberty Bank, over the phone, telling him of Caldwell & Co.'s bid. Cooper said that he would "raise the bid $10 to get the chance to buy the bonds." It appears that the boat on which Rourk came from Southport reached Wilmington about 5 o'clock p. m.

Thomas E. Cooper was, and had been for some time prior to December 21, 1922, president of both banks. H. C. Cooper was cashier of the Commercial National Bank. Thomas Folger, national bank examiner, reached Wilmington, N. C., on December 21, 1922, for the purpose of making an investigation of the financial condition of the Commercial National Bank. He was, with the aid of an assistant, engaged in such investigation until December 29, 1922. Dur-

ing the afternoon of that day he wired the Comptroller at Washington, advising that the bank be closed, and at about 6 o'clock of the same day received direction to close the bank, which he did at 8:30 on the morning of December 30, 1922.

It appears by the books of the bank that on December 29th the Liberty Savings Bank deposited in the Commercial National Bank a draft, dated December 28th, drawn by J. C. Rourk, cashier, on Caldwell & Co., Nashville, Tenn., payable to the Commercial National Bank, for $40,000, to which was attached the bonds received by Rourk at Southport, at 2:30 o'clock on that day. The deposit check contained, in addition to said draft, which is the first item listed, 14 other items, aggregating, with said draft, $41,268.21. On the same day Rourk, cashier, drew a check on the Commercial National Bank, payable to Caldwell & Co., for $800. The draft of $40,000, with the bonds attached, was forwarded by the Commercial National Bank, on December 29th, for collection, to the Bank of Tennessee at Nashville.

The deposit was, on December 29th, credited to the Liberty Savings Bank on the general ledger. The books show that, at the time the credit was entered, the account of the Liberty Savings Bank on the general ledger was overdrawn $10,401.37. Immediately following the credit item, the account contains an entry charging the Liberty Bank "special account $20,000," resulting in a balance to credit of Liberty Bank of $9,042.66. On December 23, 1922, the overdraft of the Liberty Bank was $2,713.16, which increased until December 29th to $10,401.37.

The check for $40,000, given by Rourk, cashier, to the treasurer of Southport, and immediately indorsed to the Liberty Bank, was never presented for payment. On December 30, 1922, the city attorney of Southport, learning that the Commercial Bank had been closed, wired the bonding attorneys, employed to give an opinion as to the validity of the bonds, not to do so.

It appears that, while the draft and bonds were in the possession of the Bank of Tennessee, some person, whose name is not disclosed in the evidence (Thomas E. Cooper, in his answer, says the Commercial National Bank), instructed the bank to deliver said draft and bonds to Noah W. Cooper, residing in Nashville. This was done, and they were thereafter returned to the bank, and by it returned to the Commercial National Bank. The draft and bonds were, at the date of the summons herein, and are now, in the possession of defendant C. L. Williams, receiver, held subject to the decree of the court in this action.

Miss M. C. King, employed as bookkeeper by the Liberty Savings Bank on and prior to December 28, 1922, was shown the deposit check of $41,286.21. She said:

"I think I made this out. I made it before I closed the bank. We close at about 2 o'clock. No; I don't remember having a telephone message. I think I did. I would not be certain, but I think I made it out before the bank closed. I don't know when I got the $40,000. I remember Mr. Rourk went down to Southport about these bonds. He came back on the Wilmington [boat]. It gets here at 5 o'clock."

To the question:

"Don't you know that the item of $40,000 represented those Southport bonds?"

—she responded:

"It must have." "Is it likely you would have made out that statement on Nashville, Tenn., before Rourk got back with the bonds and made the draft?" "Yes, sir; it is.". "How did you know it was going to be $40,-000?" "I think I did." "Who told you?" "I don't remember anybody telling me." "You didn't know?" "No, sir." "When Rourk came back, he bought some bonds from Southport, didn't he?" "Yes, sir." "And that $40,000 is that bond transaction?" "Yes, sir."

While the testimony of this young woman is confused, I am of the opinion, in the light of the other evidence, that she made out the deposit check (typewritten) by direction of some officer of the bank, before Rourk returned from Southport at 5 o'clock. It will be noted that, although the bonds were not delivered to Rourk, in Southport, until about 2 o'clock of the 29th of December, the draft on Caldwell & Co., upon which the words, "With $40,000 bonds attached hereto of the city of Southport, North Carolina," and the words, "Bonds and other documents attached," written thereon, bears date December 28, 1922. The draft is on the stationery of the American Bank & Trust Company, the name of the Commercial National Bank prior to its being made a national bank, in May, 1922. There is no evidence that the Liberty Bank had made a contract to sell the bonds to Caldwell & Co., or had any correspondence with them in regard to the sale of the bonds.

The Commercial National Bank was found by the examiner to be insolvent. He says that he made a careful examination of the notes and other assets—talked them over with the officers; that a very "liberal" proportion of the notes represented renewals. There is no suggestion that the bank had recently sustained losses. Its insolvency is due to a very large amount of bad, uncollectible paper, probably as much as $600,000 or $700,000. I am of the opinion, in the light of the evidence and the failure of the president, or any director or other officer, of the bank to appear or be summoned as a witness, that the officers knew, or certainly should have known, on December 29, 1922, that the bank was hopelessly insolvent. The examiner says that he did not inform the officers that he had found a large quantity of bad, uncollectible notes, or that he intended to close the bank, but that he went over the paper with the officers, asking questions; "we discussed them as we passed over them; found but little paper in the bank but what had been renewed;" that the comptroller never directs a bank closed until found to be hopelessly insolvent. He says that the books showed that the bank had a "special account" with the Liberty Bank of $20,000; that it had been kept "at least for a month." There is no very satisfactory evidence as to the way this account originated, or how the Liberty Bank became indebted to the Commercial Bank for the amount. It was not kept on the general ledger, but as a "special account."

The Liberty Savings Bank was chartered and operated under the

state law. It had a capital of $25,000, and surplus fund of $1,000. On December 29, 1922, as appears from a statement made to the state commission, it had—

"Loans and discounts, $197,937; demand loan, $6,000; overdrafts $550. Other items, including banking house and furniture, mortgages, etc., $24,223. Due from national bank, notes, $4,313; cash items $459.85. Its liabilities were capital stock, surplus, and undivided profits. $36,786.52; notes rediscounted and bills payable, $40,000; deposits, $201,978.74."

The statement does not show any amount due the Commercial National Bank, or any national bank. The Liberty Savings Bank was, on February 2, 1923, found to be insolvent, and placed by the corporation commission in the hands of J. W. Little, Esq., receiver, who is administering its assets for the benefit of its creditors.

On the Saturday next after the Commercial Bank was closed, the cashier of the Liberty Bank offered to the president of the Murchison National notes of the bank to the amount of $18,000 as security for a loan of $10,000, which was refused; a loan of $5,000 was offered and declined. Three days before the Liberty Bank was closed, the cashier took $18,000 to the same bank, upon which a loan of $5,000 was made. The president testified that, in his opinion, there was very little margin; that the loan was very close to the value of the collaterals. The notes were largely against persons resident in the city.

Mr. Grainger has been connected with the Murchison Bank since 1899, president for the past two years. He was shown a list of the paper held by the Liberty Bank, and requested to examine it carefully and give his opinion as to the value of the notes. After several hours, he returned to the courtroom and stated that he "had gone through the list and was of the opinion that the notes would not yield "over 25 per cent." They aggregated $204,165. The statement made by the cashier, January 11, 1923, showed liabilities, exclusive of capital and undivided profits, to be $241,976. There is no evidence tending to show that the Liberty Savings Bank sustained any loss between December 29, 1922, and February 2, 1923. It is manifest that the bank was hopelessly insolvent on December 29, 1922. The Liberty Savings Bank received on deposit, between December 29, 1922, and February 2, 1923, $113,421.19, and paid out on checks $144,959.90; expense account, $1,038.87; interest account, $1,016.31. On December 29th it had cash $5,085.32; February 2d, $1,489.47.

At the time the bonds were delivered to Rourk, he delivered to the treasurer of Southport a bond, executed by the Liberty Savings Bank, with Thomas E. Cooper, J. W. Brooks, U. A. Underwood, and J. C. Rourk, sureties, purporting to secure the payment of such drafts or checks as the treasurer drew on said bank. The condition of the bond will be dealt with later. The sureties are solvent. Neither the mayor, commissioners, nor other officers of Southport had any knowledge of, or reason to believe, that the Liberty Savings Bank, or the Commercial National Bank, were insolvent, or in danger of insolvency, on December 29, 1922. Neither president nor

cashier of the Liberty Bank was introduced as a witness. I find as a fact, from the evidence, that both the president and cashier knew that the Liberty Savings Bank was on December 29, 1922, insolvent.

On February 8, 1923, the plaintiff, city of Southport, instituted in the superior court of Brunswick county this action against C. L. Williams, receiver, the Liberty Savings Bank, Thomas E. Cooper, U. A. Underwood, J. W. Brooks, and J. C. Rourk, for the purpose of securing the return of the bonds and such other relief as the court should find it entitled to. The judge of said court made an order restraining the receiver from disposing of the bonds pending the litigation. On the 25th day of February, 1923, upon the petition of C. L. Williams, receiver of the Commercial National Bank, the cause was removed into this court.

Upon the motion of J. W. Little, receiver of the Liberty Savings Bank, he was permitted to intervene herein and assert a claim to said bonds as the property of said bank. Plaintiff seeks to recover the bonds for that, as it alleges:

"The said Thomas E. Cooper and the said Commercial National Bank never intended to actually pay the drafts given to the city of Southport for the purchase of said bonds, nor did they expect or intend that the city of Southport should actually be paid for said bonds, and the said banks and the said Thomas E. Cooper knew that they [said banks] were hopelessly insolvent and were unable to meet their just obligations and debts, and, if they did not know it, they should have known it, and the said Thomas E. Cooper knew, or should have known, that both of the said banks would, within a short time, be declared to be insolvent, before the said city would be able to receive any sum whatever for said bonds. * * * That the Commercial National Bank, not having paid anything of value for said bonds, and never intending to do so, and the Liberty Savings Bank surrendering said bonds to the said Commercial National Bank, without intending to collect or collecting the purchase price thereof, and having received nothing from said bonds, and it being the intention and purpose of the parties to get the said bonds, or the proceeds, without paying the said city of Southport anything for the same, that the action of said banks and the city of Southport is a nullity and no valid title passed from said city of Southport to the alleged claimant of said bonds, the said bonds having been secured upon the implied, if not the express, representation that the said banks were solvent," etc.

J. W. Little, receiver of the Liberty Savings Bank, answering upon information and belief, denies the allegations material to plaintiff's alleged right to recover the bonds, and avers that, by the transactions set out in the bill and admission in his answer, the Liberty Savings Bank acquired title to said bonds, and that he, as receiver, is entitled to the possession thereof, for the purpose of discharging his duty in the administration of the assets of said bank. He alleges that the draft drawn by J. C. Rourk, cashier, on December 28, 1922, on Caldwell & Co., to which the bonds were attached, was deposited with the Commercial National Bank on December 29, 1922, for collection and not for credit to the general or special account of said bank. The receiver prays the court to direct the return of said draft and bonds to himself as receiver.

The receiver of the Commercial National Bank, answering upon information and belief, denies the allegations upon which plaintiff

bases its right to have the bonds returned, and by way of further defense alleges:

"That the bonds were attached to the draft drawn by the Liberty Bank on Caldwell & Co., and deposited with the Commercial Bank with its regular deposits as a part of said deposits in the regular course of business, and credited to the account of the Liberty Bank in its general deposit in said bank, which it had the right, and exercised such right, to do. That by such deposit and application the Commercial National Bank became the bona fide purchaser of said bonds for value, without notice of any equities of any of the parties to this action. That plaintiff did not act with due diligence in asserting its alleged equities."

Thomas E. Cooper, answering, denies that either the Liberty Savings Bank or the Commercial National Bank were, on December 29, 1922, insolvent. He avers that, if permitted to continue in business, the Commercial National Bank would have been successful in its operations, etc. Defendant Cooper avers:

That the "Commercial National Bank, after it had been closed by the bank examiner, but before it was declared insolvent, and before a receiver was appointed, wired the Bank of Tennessee to deliver the said bonds to Noah W. Cooper, attorney."

J. W. Brooks and U. A. Underwood, sureties on the bond, who are members of the board of directors of the Liberty Bank, answering the bill, admit the material allegations of the bill, and allege, on information and belief:

That the Commercial National Bank has been insolvent for a long time, and was at the time referred to in the bill hopelessly so. "That the Liberty Bank has been insolvent for a comparatively short time, but was insolvent at the times referred to, when the negotiations for the purchase of the bonds from the city of Southport were had and the purchase was made."

Further answering, these defendants allege:

"That it was distinctly understood and agreed that the bond which was to be given by the Liberty Savings Bank, which was signed by the defendants, was not to become operative and in effect unless and until the bank received the actual funds for said bonds, as will appear from the copy of the bond attached to the complaint. That when they signed the bond they were led to believe, and did in fact believe, by and through the acts and doings of Thomas E. Cooper and J. C. Rourk, that the Liberty Savings Bank had in fact got, or was on the point of getting, actual cash for the bonds, and it was under this false impression, induced by the acts of the said Cooper and said Rourk, that defendants signed the bond, and they submit that the bond is inoperative and void."

They further deny that the Liberty Savings Bank is liable on the certificates of deposit given to the city of Southport in violation of the provisions of chapter 4, section 44, of the Public Laws of North Carolina of 1921, which provides that:

"It shall be unlawful for any bank to issue any certificates of deposit or other negotiable instrument of its indebtedness to the holder thereof except for lawful money of the United States, checks, drafts, or bills of exchange, which are the actual equivalent of such money."

The bond recites that:

"Whereas, the Liberty Savings Bank has received from the city of Southport the sum of $40,000, money of said municipal corporation, to be used and expended by the said city."

Following a further recital of the terms of the resolution adopted by the board of aldermen, in regard to the said deposit and the dates upon which the city was entitled to draw on the deposit, the condition of the bond is in the following language:

"If the said Liberty Savings Bank, its successors and assigns, shall well and truly keep said sum of $40,000 from the date of this obligation, and pay out to the legal and regular check or checks of the said city of Southport, on March 1, 1923, or at any time thereafter, not more than $25,000 on March 1, 1923, and shall on January 1, 1924, or at any time thereafter, upon presentation of the legal check or checks of the city of Southport, the full balance of $15,000, then this obligation to be null and void."

[1] It is not necessary to decide or express an opinion as to the validity of the defenses set up by the sureties on the bond. This very singular transaction, from start to finish—from the proposition submitted by the city of Southport to sell, to the accepted bidder, its municipal bonds to the amount of $40,000, for cash or its equivalent, to be used in the construction of necessary public utilities for which a contract had been made, the terms of which, as to dates of payment for the work, were known to the president and cashier of the Liberty Bank, to the time of securing the possession of the bonds, and the time, manner, etc., of disposing of them—calls for clear, frank, unquestionable explanation by the president and cashier of the banks concerned and claiming the bonds. In the absence of such explanation, the inference is irresistible that such officers intended by the unusual means resorted to—

"to secure the possession of the bonds and dispose of them to the Commercial Bank, with no intention of paying to the city of Southport the proceeds thereof, according to the terms of the contract or the certificates of deposit; that they knew the condition of the Liberty Bank at the time said check was given and certificates issued."

The two sureties on the bond, who were directors of the Liberty Bank, in their verified answer, allege that said bank was hopelessly insolvent at the time the purchase was made. The check given by Rourk, cashier, to the treasurer, for the purchase price of the bonds, instead of being "cash or its actual equivalent," was utterly worthless. The account of the Liberty Bank was, and had been for some time, heavily overdrawn at the Commercial National Bank, which was, at the time the checks were given, hopelessly insolvent, and within a few hours after the draft and bonds were deposited closed, because of insolvency, by the examiner. Rourk went to Southport December 28th to secure possession of the bonds, without providing himself with either "cash or its equivalent," and, when delivery of the bonds was refused until he complied with the terms of the resolution authorizing the mayor and treasurer to deliver the bonds, said that he "would get in touch with Mr. Cooper and get the money or its equivalent down on the boat next day." Mr. Cooper was then president of both banks. He knew their condition and that the examiner was, and had been for more than a week, making a close examination of the Commercial National Bank. He knew, or certainly, in the absence of any denial, must be taken to have

known, that the Liberty Bank was overdrawn, and due by "special account;" the Commercial Bank $31,000. Both Cooper and Rourk knew that the check for $40,000 which was given for the bonds as "cash or its actual equivalent" was utterly worthless. The giving, taking it back, and issuing certificates of deposit were but premeditated steps in "closing the deal." The hasty departure of Rourk with the bonds, which, immediately upon reaching Wilmington, he attached to a draft on Caldwell & Co., payable to the Commercial Bank, drawn December 28, 1922, and the equally hasty trip to that bank, certainly after business hours, with a deposit check, as testified by Miss King, the bookkeeper, made up before the Liberty Bank closed for the day, and before Rourk returned to Wilmington, which was credited to the overdrawn account, and the "special account" carried to the general ledger for the first time.

After the deposit was credited to the general ledger, the Commercial Bank, on the same day or night, forwarded the draft and bonds for collection to the Bank of Nashville, Tenn.; the Liberty Bank, drawing a check for $800, payable to Caldwell & Co., with whom, so far as appears, it had no contract to sell the bonds, all call for explanation. Rourk stated to the commissioners, before getting possession of the bonds, that his bank "was all right; good; doing fine" ; that "they had sold or engaged these bonds to the members of the Christmas Club." It is difficult to repress the inquiry why, when so hastily disposing of the bonds and putting them beyond the control of the Liberty Bank, it did not occur to the president or cashier of that bank to present the check, which they had, a few hours before, delivered to the treasurer, as "cash or its actual equivalent," and immediately taken back for deposit, for payment, and thereby have gotten what they had represented to the treasurer and other officers of Southport to be "equivalent to cash," and which they represented to the sureties on the bond would constitute money into the vaults of the Liberty Bank before the bond would become effective.

It appears from the evidence of the examiner that the Commercial National Bank had, on December 29th, "between $40,000 and $50,000 cash" with which to pay the check. Why could not the Liberty Savings Bank have drawn the draft on Caldwell & Co., attached the bonds, and forwarded them for collection to the bank in Nashville on its own account? Is it not manifest, from the manner in which the "deal" was conducted and consummated, that it was the purpose of the president of both banks to secure and use the bonds to cover a large unsecured indebtedness of the Liberty Bank to the Commercial National Bank then being examined. The examiner, at about the very hour when these bonds were delivered to the Commercial National Bank, received instruction from the Comptroller to close the said bank, because said examination had shown it to be insolvent. It is true that the president had not been informed of such instruction at the time the bonds were deposited, but is it probable, or possible, that, in the light of the testimony of the examiner, the result of such examination was not foreseen and anticipated by the president and officers of the bank.

The case, viewed from the uncontradicted evidence, comes to this: The bonds was procured by the Liberty Bank by means and methods violative of every statute of the state enacted to secure honest, fair dealing in such transactions, and by representations and conduct of overwhelming probative force showing that the officers of the Liberty Bank never intended that the Liberty Bank should pay for or own the Southport municipal bonds; that it was their purpose to secure and use them to carry the Commercial National Bank over a crisis, or to cover a large overdraft by an insolvent bank closely allied with the Commercial Bank, Mr. Cooper being president of both banks. The Liberty Bank has not paid a dollar for these bonds, nor has the Commercial Bank parted with anything of value.

[2] The suggestion in the answer that it is a purchaser for value of the bonds in due course, without notice of the equities and rights of the city of Southport, is without merit. It will not be seriously contended that the president of one insolvent bank may, by the means disclosed in the evidence, secure possession of municipal bonds and by delivering into the possession of another bank equally insolvent, of which he is also president, vest title in the second bank as a purchaser for value without notice, so as to consummate a fraud and deprive the true owner of the bonds of a remedy in a court of conscience.

I do not deem it necessary to discuss the merits of the claim asserted by the receiver of the Liberty Bank to the bonds, upon the theory that the draft to which they were attached was deposited with the Commercial Bank for collection. This is denied by the receiver of the Commercial National Bank. It is a significant fact that the draft is made payable to the Commercial National Bank. I am of the opinion that the president and cashier of the Liberty Bank intended to dispose of the bonds and the proceeds of their sale to the Commercial National Bank. This, however, is immaterial. Neither bank is entitled to withhold them from the plaintiff.

[3] It is strongly insisted by the receivers of the Liberty Bank that the city of Southport is estopped to assert its claim to the bonds because the action was not brought until February 8, 1923, and that between the 29th of December, 1922, and the appointment of the receiver, the bank continued operating, receiving deposits and paying checks. I am unable to perceive how the delay in bringing the suit misled any one who made deposits in the bank. No statement was published by the Liberty Bank after December 29th, and if one had been made it could not have showed the possession of these bonds. They were not permitted to rest for an hour in the vault of the bank. They were in transit from the moment Rourk took them from the treasurer in Southport until they were in the hands of the bank of Tennessee, far beyond the control of the Liberty Bank.

[4] The principle upon which the equity or right asserted by the plaintiff to rescind the sale of the bonds and have them returned is found in the dictates of fair dealing and common honesty. It is clearly stated by Mr. Justice Davis in Donaldson v. Farwell, 93 U. S. 631, 23 L. Ed. 993:

"The doctrine is now established by a preponderance of authority that a party not intending to pay, who * * * induces the owner to sell him goods on credit, by fraudulently concealing his insolvency and his intent not to pay for them, is guilty of a fraud, which entitles the vendor, if no innocent third party has acquired an interest in them, to disaffirm the contract and recover the goods."

In Gillespie v. Piles (C. C. A. 8th Cir.) 178 Fed. 886, 102 C. C. A. 120, 44 L. R. A. (N. S.) 1, Judge Sanborn says:

"A vendor, who sells personal property to an insolvent vendee, who at the time he buys does not intend to pay for it, may rescind the sale and recover the property or its proceeds, from any one but an innocent purchaser. * * * An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay for his purchases, is conclusively presumed to have bought them with an intention not to pay for them; and a persuasive legal presumption to that effect arises from the fact that such a purchaser's affairs were in such a condition at the time of the purchase of the property that he could then have had no reasonable expectation of paying for it."

Pollock, in his work on Contracts, referring to the decision in Hemingway v. Hamilton, 1 M. & W. 115, says:

"Both before and since that time it has repeatedly been considered a fraud in law to buy goods with the intention of not paying for them. Here it is obvious that the party would not enter into the contract if he knew of the fraudulent intention; but that the fraud is not so much in the concealment as in the character of the intention itself." Contracts (2d Am. Ed. Wald.)

See In re Hunter Rand Co. (D. C.) 241 Fed. 175; Wilson v. White, 80 N. C. 281 (Annotated Ed.).

It would hardly be suggested that, if the mayor and treasurer of Southport had known, at the time they parted with the bonds, that Rourk had drawn the draft on Caldwell & Co., made arrangements to turn the drafts and bonds over to the Commercial Bank, that the check given by him on that bank was worthless, and that both banks were insolvent, they would have delivered the bonds to him. The uncontradicted evidence is that the commissioners and other officers of the city of Southport had no knowledge or information that the Liberty Bank and the Commercial Bank were insolvent. There is no suggestion to the contrary. Plaintiff, in its bill, tenders the certificates of deposit.

While it is not very material to the decision of this case, it is appropriate to note the provision of the Municipal Finance Act (Consol. Statutes, § 2956; Pub. Acts Ex. Sess., c. 106, § 1) that "all bonds of a municipality shall be sold at not less than par." It is very doubtful whether the condition attached to the bid, by which the proceeds of the bonds are to be deposited with the purchaser without interest, is not violative of this provision. Moose v. Commissioners, 172 N. C. 419, 90 S. E. 441, Ann. Cas. 1917E, 1183. For an advance bid of $10 premium over an unconditional bid by Caldwell & Co., the commissioners of Southport surrendered the right to secure 4 per cent. interest, while paying the purchaser 5½ per cent. until the money was required to pay for the work contracted for, a loss of about $750. Certainly this method of selling municipal bonds is not to be commended.

A decree will be signed, rescinding the sale of the bonds to the Liberty Savings Bank and the attempted disposition of them to the Commercial National Bank, and directing defendant C. L. Williams, receiver of said bank, to forthwith deliver said bonds to J. H. Russ, treasurer of the city of Southport; that the certificates of deposit issued by J. C. Rourk, cashier, to said treasurer, which have been filed with the clerk, be canceled and delivered to J. W. Little, receiver of the Liberty Savings Bank; that the check issued by Rourk, cashier, on the Commercial National Bank, for $40,000, on file with the clerk, be canceled and delivered to J. W. Little, receiver; that the bond executed by the Liberty Savings Bank, with Thomas E. Cooper, J. C. Rourk, U. A. Underwood, and J. W. Brooks, sureties, be delivered to the clerk and by him canceled.

The cost will be taxed against C. L. Williams, receiver, except the cost incurred by the intervention of J. W. Little, receiver, which will be taxed against said receiver. The allowance to the stenographer will be divided between the plaintiff and the two receivers, in the proportion of one-third to each.