**In re GENERAL LUMBER PRODUCTS CO.**

District Court, D. Maryland.    October 15, 1927.

No. 4950.

1. **Bankruptcy** ⊙═►140(2)—**Seller, to recover goods sold bankrupt, must show bankrupt was knowingly insolvent and did not intend to pay.**

To entitle the seller to reclaim goods sold to bankrupt, and which passed to its trustee, it must be shown (1) that bankrupt was insolvent when the goods were brought, (2) that it knew such fact, and (3) had the intention not to pay for the goods.

2. **Bankruptcy** ⊙═►212—**Evidence held not to entitle seller to reclaim goods sold to bankrupt.**

Seller *held* not entitled to reclaim goods sold to bankrupt corporation from its trustee, where though bankrupt was insolvent when the goods were bought, the fact was not known to the officer who made the purchase in the usual course of business and who in good faith intended and expected to pay for them.

3. **Bankruptcy** ⊙═►140(2)—**Fraudulent conduct only will entitle seller to reclaim goods sold to bankrupt from trustee.**

The kind of concealment and intention not to pay which will entitle a seller to reclaim goods from the trustee in bankruptcy of purchaser must be tantamount to fraudulent conduct.

In Bankruptcy. In the matter of The General Lumber Products Company, bankrupt. On exceptions to decision of referee denying petition of the R. B. Homer Lumber Company to reclaim certain lumber. Exceptions overruled.

F. Hall Hammond, of Baltimore, Md., for petitioner.

William Lentz, G. W. S. Musgrave and J. Purdon Wright, all of Baltimore, Md., for receiver and trustee.

COLEMAN, District Judge. This case arises on exceptions to the findings of the referee in the matter of the petition of R. B. Homer Lumber Company for the reclamation of certain lumber sold to the bankrupt, which petition was dismissed by the referee. His report in full is as follows:

"The bankrupt was a corporation engaged in the purchase and sale of lumber and builders' supplies, in Baltimore city. Its principal office appears to have been in Uniontown, Pa. All of its books were kept there, and all of its financial affairs were conducted from that office.

"Mr. Browne was the president of the company, and had charge of the Baltimore office, and made all purchases and sales for the company. He had charge of the local pay roll, but the monthly pay roll was handled from the Uniontown office.

"Mr. Palmer acted as the general manager of the company, and had charge of the latter office, and attended to the financial affairs of the company from that office. While Browne was president of the company, he appears to have been president in name only, as he took his orders from Palmer, who was also the principal stockholder of the company.

"On February 18, 1927, Browne purchased from the Homer Lumber Company, the petitioner herein, 13,628 feet of No. 1 box rough pine lumber through Mr. Albach, the salesman of the Homer Company. This lumber was immediately hauled from the municipal pier, where it had been stored, to the yard of the bankrupt, where it was stored with other lumber of similar character, and, at the time of the bankruptcy, the greater portion, if not all, of it was still in the yard. Mr. Albach testified that he saw it about two weeks later, and identified it by the name of the Homer Lumber Company stamped on the ends of some of the boards.

"On February 28th, ten days after the sale, a bill in equity was filed in the state court for the appointment of a receiver for the General Lumber Products Company, Inc.

"Upon receiving notice of this action on the part of one of its creditors, Mr. Palmer came to Baltimore and consulted Mr. Scheu, his attorney. He assured Mr. Scheu that the company was solvent and would be able to pay its creditors in full, if the matter was properly handled; that he was the holder of $51,000 of its preferred stock, and that he did not want the assets sacrificed, as he was satisfied that with proper handling the company would not only be able to pay its creditors in full, but that he would receive a substantial amount on account of his stock; but that, inasmuch as the Bank of Dunbar, which handled the company's financial affairs, had closed its doors, thereby embarrasing the company in its financial transactions, he thought it expedient to consent to the appointment of a temporary receiver to take charge of the company until the matter could be straightened out, which would be a matter of only a few weeks. Acting on this suggestion, the company consented to the appointment of receivers.

"On March 18, 1927, an involuntary petition in bankruptcy was filed against the company. Acting upon the assurance of Mr. Palmer that the company was solvent, Mr. Scheu, as its counsel, took steps to resist an adjudication. After repeated efforts to se-

cure the books of the company, he sent Mr. Browne to Uniontown to secure them, and upon his return an accountant was employed to audit them, who, after working on them for several days, reported that the company was hopelessly insolvent. This was about three or four days prior to the adjudication. Up to this time every one connected with the company thought it was solvent. An adjudication followed this discovery, and receivers were appointed by this court.

"Mr. Browne, who was called as a witness by the petitioner, testified that he purchased the lumber in question in the usual course of the business of the bankrupt; that he had no knowledge of the insolvency of the company at that time, and that he fully expected the company to be able to pay for it; that he did not know of the insolvency of the company until he was informed of it by the auditor. He stated that he had no knowledge of the financial condition of the company between February 18th and 28th, but believed it to be solvent. He admitted that he knew that the company had outstanding notes which were maturing, but he did not know the amount or to whom they were payable. It was his habit to sign notes of the company in blank, at the request of Palmer and that the latter negotiated them, and that he (Browne) did not know to whom they were given or when they matured, as he did not have access to the books. All he knew about the business, except in the purchase and sale of lumber, was what Palmer told him.

"He also admitted that some of the creditors were making demands for payment of their account, but that all of these were referred to the Uniontown office, and he supposed that Palmer would attend to them.

It is admitted that the lumber was sold to the company, that it was not paid for and that a large portion, if not all of it, came into the possession of the receivers, and that it was sold by the receivers with the rest of the assets of the company.

"The R. B. Homer Lumber Company, on the 5th of April, filed its petition, asking for the return of the lumber or that the receivers pay to it the purchase price. To this petition the receivers filed their answer contesting the right of the claimant to the return of said lumber, and, upon the petition of the claimant, the matter was referred to the referee to hear and determine the same and report his findings to the court.

"The three requisites necessary to entitle the claimant to a recovery are (1) the insolvency of the debtor at the time the sale was made; (2) the concealment of the insolvency; and (3) an intent not to pay for the goods at the time they were bought.

"1. The claimant's own witness, who was the president of the company, testified that at the time he made the purchase he thought the company was solvent and able to pay for the lumber; that he purchased it in the regular course of its business, and that he purchased other merchandise subsequent to the purchase of this lumber, which was not paid for; that he did not know that the company was insolvent until some time in March, when he received information to that effect from the auditor who examined the books of the company. No other evidence was offered on the question of insolvency except the testimony of Mr. Scheu, a witness for the trustee who testified, without objection that Palmer assured him that the company was solvent at the time the bill for a receiver was filed in the circuit court. It does not necessarily follow that, if the company was insolvent in March, it must have been so in February. I do not think the claimant has met the burden of proving insolvency at the date of the purchase, to wit, February 18, 1927.

"2. If the bankrupt or its officers honestly believed that it was solvent, and had no knowledge of its insolvency, and I so find, there could, of course, be no concealment of that fact.

"3. No evidence was offered by the claimant of an intent on the part of the bankrupt not to pay for the lumber. In fact, Browne testified that he expected to pay for it, and there is no evidence before me sufficient to raise a legal presumption of intention not to pay for it.

"The referee therefore recommends that the petition of the R. B. Homer Lumber Company be dismissed."

[1] Upon the hearing on the exceptions, the case was reopened for the taking of testimony, but it does not appear that, to any material extent at least, the evidence differed from, or was more extensive, than the evidence originally presented to the referee. He is correct in his statement that, in order to entitle the claimant to recover, the burden is upon claimant to show, first, insolvency of the bankrupt at the time of the sale; second, concealment from claimant at that time of the fact of insolvency; and, third, intention on the part of the bankrupt at that time not to pay for the goods.

Taking up these exceptions in the above order, the referee found, first, that the claimant had not met the burden of proving insolvency at the date of the sale, namely, Feb-

ruary 18, 1927, which was one month prior to the filing of the involuntary petition. On this point, the court differs with the referee, because now, if not at the original hearing, it appears that there is no real dispute that the bankrupt was insolvent on February 18, 1927, and probably for some time previous thereto. At least, the court thinks that it was proved, if in fact not practically conceded, that at that time its property at a fair valuation amounted to less than its indebtedness. Numerous creditors were demanding payment, and suits were threatening. The company was carrying heavy liabilities on its books which could not be met; some of the obligations being for usual overhead expenses.

[2] With respect to the second and third points, however, the court agrees with the referee that the claimant has not sustained the burden of proof; that is, has not satisfactorily shown that the bankrupt *concealed* its insolvency, or that it did not intend to pay for the goods when they were purchased.

When a bankrupt purchases goods on credit and is subsequently unable to pay for them, it is settled that the vendor cannot reclaim them from the trustee on the ground of fraud where there is mere absence of knowledge of insolvency. Matter of Isaac Berg (D. C.) 183 F. 885, 25 Am. Bankr. Rep. 170; In re Empire Grocery Co. (D. C.) 277 F. 73. As was said in the latter case, page 74:

"In this case, when the goods in question were delivered, the buyer was deeply insolvent. Those in charge of it did not realize that fact. Wallace, who was its treasurer and 'executive officer,' seems to have kept reasonably close track of its affairs. About three months before the bankruptcy he had paid $8,500 for a half interest in the alleged bankrupt, and until less than a month before the filing of the petition against it he was trying to arrange the sale of an issue of its preferred stock. He was not aware of the unsatisfactory character of its accounts receivable, on which it made heavy losses, and, while he feared it would make a large loss on its sugar contracts, he was hoping that some way might be found to arrange or postpone the settlement of them. It is not shown that his failure to appreciate the seriousness of the company's condition was due to such ignorance of its affairs as I have referred to, nor that his expectation, at the time of these purchases, that the company would be able to continue, was so without foundation as to be fanciful and illusory. The learned referee has found that those in charge of the company's affairs acted in good faith, and upon a careful reading of the testimony I am not prepared to say that his finding is clearly wrong."

Also, even if the purchaser knows he is insolvent, yet honestly and with some reason believes he will be able to pay, there is no ground to allow reclamation. Gillespie v. J. C. Piles Co. (C. C. A.) 178 F. 886, 44 L. R. A. (N. S.) 1; In re B. & R. Glove Corp. (C. C. A.) 279 F. 372. At least the burden of proving that under such conditions there was fraud is upon the petitioning creditor. Schroth v. Monarch Fence Co. (C. C. A.) 229 F. 549. In short, the weight of authority, as evidenced by the better considered cases, appears to be that proof of willful concealment is necessary in cases involving transactions with mercantile concerns such as the present one, before the requirements of the law with respect to concealment and intention not to pay for the goods are met. In re Marengo Mercantile Co. (D. C.) 199 F. 474; City of Southport v. Williams (D. C.) 290 F. 488; In re Barnet Mfg. Co. (D. C.) 11 F.(2d) 873.

[3] In conclusion, the court finds that, whereas the officers of the bankrupt company were undoubtedly very negligent in the conduct of its affairs, and whereas they are presumed to know of the condition of their company and cannot shield themselves behind such unwarranted ignorance with respect to the question of insolvency, nevertheless, such ignorance is not sufficient proof of itself, that these officers were fraudulent in their dealings with claimant. The kind of concealment and intention not to pay for the goods which are grounds for reclamation, must be tantamount to *fraudulent* conduct. The petitioner has not, in the opinion of the court, proved any bad faith on the part of those in charge of the bankrupt concern. In other words, it has not been proved that they did not honestly expect to be able to continue business. This is the fundamental distinction between the facts in the present case and those in the case of In re Henry Siegel Co. (D. C.) 223 F. 369, upon which counsel for petitioner particularly relies. Note the language of Judge Morton in that case (page 370):

"The intent not to pay inferable from the financial condition of the buyer, might perhaps have been rebutted by evidence that its managers honestly expected to be able to continue, and bought the goods in an effort to do so. Nothing of that sort, however, appeared."

It should be further pointed out that Judge Morton later rendered the decision in

the Empire Grocery Co. Case, above referred to, and distinguished the situation in the Siegel Case with the following language (page 74):

"Good faith, which rests only on ignorance, due to a willful, or reckless, or despairing failure to face the facts, is, in proceedings of this sort, the legal equivalent of actual fraud, and entitles the seller to reclaim his goods. In re Henry Siegel Co. (D. C.) 223 F. 369, and cases cited. On the other hand, a merchant is not obliged to close his doors as soon as he becomes aware of his insolvency. If he faces his situation, and really believes that he can pull out by keeping on, his purchases made for that purpose are not fraudulent, provided that his belief is not illusory merely, and without any reasonable ground for it."

See, also, In re Gurvitz (D. C.) 276 F. 931.

Therefore the findings of the referee are sustained on the question of concealment and intention, and the exceptions must be overruled.