**ENDICOTT JOHNSON CORPORATION,**
a Corporation, Plaintiff,

v.

**Walter SCOTT, as Trustee in Bankruptcy of the Estate of Harold Vinston Lemley, Defendant.**

Civ. No. 4199.

United States District Court
D. Wyoming.

Jan. 27, 1959.

David N. Hitchcock, Laramie, Wyo., and Meyer M. Kahn, St. Louis, Mo., for plaintiff.

Walter Scott and G. R. McConnell, Laramie, Wyo., for defendant.

KERR, District Judge.

Endicott Johnson Corporation, a corporation, hereinafter referred to as "seller", brings this action against Walter Scott, as Trustee in Bankruptcy of the Estate of Harold Vinston Lemley, hereinafter referred to as "Trustee" and "purchaser", to reclaim from Trustee certain shoes, or, in the alternative, to recover in cash the full value of the goods sold to the purchaser.

The seller's principal business is supplying, selling and delivering shoes to retail dealers. It is the theory of the seller that on February 24, 1958, purchaser prepared, signed and mailed to seller a property statement and attached thereto as a part thereof, showing and representing to seller that on January 2, 1958, purchaser had total assets of $44,403.70, total liabilities of $13,839.45, and a net worth of $30,564.25; that the purchaser further represented that during the period from January 2, 1957 to January 2, 1958 his total sales had been $51,377.60 and a net profit of $7,770.75; the seller further contends that the financial state-

ment was delivered to it with the intention that it would accept the same as accurate, and, in reliance thereupon, would extend credit to purchaser and ship him shoes on such credit; the seller further alleges that the information was grossly false and misleading, as the purchaser well knew, and that this conduct on the part of the purchaser constituted *deliberate fraud;* that when the financial statement was prepared and delivered to the seller the purchaser was insolvent and had *no reasonable expectation of paying for goods ordered* from and shipped by the seller in accordance with his orders.

The Trustee interposes the defense that the financial condition of the purchaser was well known to the seller at the time the alleged financial statement was submitted; that an employee of the seller suggested the method of preparation of the financial statement for the purpose of consummating a sale; that the seller had other methods of determining the financial condition of the purchaser and did in fact make further investigation and well knew the insolvency of the purchaser at the time the financial statement was made on January 2, 1958.

The cases are many in which this same type of litigation has been before the courts. Taylor v. Fram, 2 Cir., 252 F. 465; Samson Tire & Rubber Co. v. Eggleston, 5 Cir., 45 F.2d 502; In re Forsythe Shoe Corporation, D.C., 3 F. Supp. 328; Reliance Shoe Co. v. Manly, 4 Cir., 25 F.2d 381; Manly v. Ohio Shoe Co., 4 Cir., 25 F.2d 384, 59 A.L.R. 413; Edgewood Shoe Factories, Division of General Shoe, Corp. v. Stewart, 5 Cir., 107 F.2d 123; Liebowitz v. Voiello, 2 Cir., 107 F.2d 914; Yarm v. Whitcup, D.C., 46 F.2d 117; In re Triangle Shoe Mfg. Co., D.C., 7 F.2d 704; In re McCrory, D.C., 26 F.2d 294; Ellet-Kendall Shoe Co. v. Martin, 8 Cir., 222 F. 851; In re Leflys, 7 Cir., 229 F. 695; Ludvigh v. American Woolen Co., 231 U.S. 522, 34 S.Ct. 161, 58 L.Ed. 345; In re Gold Band Curtain Co., D.C., 18 F. Supp. 847; In re Penn Table Co., D.C., 26 F.Supp. 887; In re General Lumber

Products Co., D.C., 21 F.2d 979. It is true by differences of fact no one case becomes an exact precedent for another, yet a uniform principle pervades them all.

■ A perusal of the above authorities persuades me to the belief that in order for seller to recover in this reclamation proceeding it must prove three requisites: (1) the insolvency of the purchaser at the time the sale was made; (2) the concealment of the insolvency; and (3) *intent not to pay for the goods at the time they were bought.*

I will review the undisputed testimony as gathered from the evidence and exhibits and attempt to determine whether the evidence offered on the part of the seller squares with the decided cases.

### Evidence.

During the month of August 1956 purchaser placed an order for shoes with the seller and deposited with it twenty-five budget checks in accordance with an agreement entered into between seller and purchaser; it may be assumed, after an examination of this record, that the checks were paid as there is no evidence to the contrary; on December 11, 1956, the seller advised the purchaser that it had completed its necessary credit investigation and had approved the orders for shipment made by the seller; the seller further advised the purchaser: "It is pleasing to note that a considerable reduction, amounting to approximately $4,000, has been accomplished in your accounts payable since the financial statement you sent to us as of January 1, 1956".; on November 15, 1956, the purchaser submitted a property statement to the seller disclosing his total assets to be $23,400 and total liabilities, $18,000; in March 1957 the seller invited the purchaser to visit its place of business in St. Louis; the object of this visit was to inspect exhibits of the seller for the purpose of determining whether the purchaser could establish a self-serving shoe store in Laramie, Wyoming; following this visit and on March 29, 1957, the seller acknowledged receipt of a financial statement executed by the purchaser while in St. Louis and further stated "As we discussed while you were here it would seem that you should have sufficient assets to provide the necessary working capital to set up the self-service shoe store especially since you already have your fixtures and since the location could be secured without any strings attached."; the evidence indicates that after seller and purchaser had been dealing with each other for approximately one year the seller was content with their business relationship.

In October 1957 the purchaser sent two wires to seller advising of depressed business conditions existing in Laramie, Wyoming; on November 20, 1957, purchaser again advised seller that business was very bad and that he could not make the large check payments; he suggested that they make a new agreement for another fifty-two weeks making weekly payments smaller; an examination of Exhibit "A", ledger sheets of seller, shows that on February 4, 1958, the purchaser owed the seller $7,104.98; on March 6, 1958, this balance had been reduced to the sum of $6,459.23; on April 3, 1958, the amount due and owing the seller was $8,168; May 5, 1958, a balance of $8,211.08 was owing to the seller; on May 28, 1958, the balance had been reduced to the sum of $5,153.86; July 14, 1958, the balance was $3,653.86; and at the time this action was filed the seller claims a balance due in the sum of $2,300.04.

In April 1958 certain employees of the seller visited the retail store of the purchaser and observed that his stock had been depleted and after conversation with him respecting his financial condition the seller and purchaser entered into two written agreements.

### Agreement No. 1.

On April 28, 1958, the seller and the purchaser entered into a written agreement; in this agreement the seller was designated as "creditor" and the purchaser as "debtor"; the agreement stated that the creditor had shipped to the debtor on open account merchandise of an invoice value of $7,918.96, for which it

had not been paid; that the debtor had submitted to the creditor as a basis for extension of credit financial statements purporting to show the debtor's financial condition completely and truly; that the financial statements were incorrect in that the amount of assets had been materially over-stated and the amount of the liabilities had been materially understatted; that the creditor had rescinded its contract of sale and affirmed title of the merchandise of its brand on hand and unpaid for, for which it shipped to the debtor in reliance upon his financial statements; the agreement provided that in consideration of the sum of $1 the parties agreed that the creditor rescinded its contract of sale and took *title* to the merchandise; the debtor thereby agreed to deliver to the creditor the merchandise listed in the exhibit attached to the agreement and agreed that he had no right, title or interest thereto; *the debtor agreed to execute an installment note payable at the rate of $40 per week, evidencing the balance due to the creditor;* the parties agreed that this adjustment and settlement brought to rest all controversies existing between them.

## Agreement No. 2.

On the same date, to wit, April 28, 1958, the seller and the purchaser entered into another agreement and there denominated the seller as "consignor" and the purchaser as "consignee"; this agreement stated the consignor thereby delivered to the consignee shoes and merchandise as listed in Exhibit "A", which is attached to the agreement, and the consignee accepted the shoes and merchandise subject to all the terms and conditions therein contained; the consignee agreed to hold and care for the shoes as the property of the consignor and agreed that the *title* to said shoes, or the proceeds, was *always vested in the consignor* and such merchandise should at all times be subject to and under the direction and control of the consignor; the *title to said shoes was to pass directly from the consignor to such person or persons to whom the same might be sold;* the consignee agreed to render a state-ment to and in the form requested by the consignor after the day's business on the last Saturday of each month during the term of the agreement; the consignee agreed to insure in the name of the consignor to the full value thereof all merchandise furnished and delivered to the consignee; *the consignee agreed to pay the taxes assessed and levied upon the merchandise;* the consignee agreed to make a weekly report on forms to be furnished by the consignor and with such weekly reports to remit to the consignor for all of consignor's merchandise sold; the consignee agreed to deposit at the end of each day's business in a special account to be known as "Harold V. Lemley, Trust Account," the wholesale cost of each pair of shoes sold and to remit weekly to the consignor the amount of the sales; the parties agreed that the contract could be terminated by either of the parties upon thirty days notice in writing; the agreement provided that in the event the consignee failed to keep and comply with the terms of the agreement, or in case the consignee should become *insolvent or its place of business be closed by attachment, insolvency proceedings or bankruptcy proceedings, or because of any assignment on his part for the benefit of his creditors,* the consignor should have the option to terminate the contract without notice and take immediate possession of its property in the hands of the consignee.

The evidence discloses that the merchandise of the seller was co-mingled with other stock in trade held by the purchaser and no attempt was made to separate the merchandise other than to make an inventory, which was attached to the agreement.

The aforesaid agreements were not recorded and creditors of the bankrupt had no notice, actual or constructive, of their existence until after the bankruptcy proceedings.

The trustee urges that the seller having failed to record these written instruments it renders them void as to creditors under Wyoming's Uniform Trust Receipts Act, Sections 59–401 to 59–420,

W.C.S.1945. It is unnecessary for the purposes of this case to decide whether these instruments come within the purview of the above Act.

Whether Agreement No. 1 was a bona fide sale through which the purchaser transferred his title to the seller will not be determined solely by the words employed. The Courts look to the purpose of the agreements and the circumstances of the parties leading up to these agreements.

There was no change in the physical status of the property flowing from these agreements—the instruments simply transferred the *naked title* from Lemley to Endicott Johnson Corporation.

Prior to these so-called agreements the record discloses that Lemley and Endicott Johnson dealt with each other as vendor and vendee. After the agreements the business continued as before except Lemley was to make weekly payments in the sum of $40 per week out of the proposed Trust Fund. Under all the circumstances of these transactions I do not think the seller is in a position to invoke these two agreements against the Trustee.

The evidence is destitute of a sufficient showing that the purchaser perpetrated fraud upon the seller through the financial statements. To the same effect the evidence falls short of showing that the purchaser did not intend to pay for the merchandise when purchased—the evidence is all to the contrary.

From what I have said I hold that the seller has failed to sustain its claim of fraud by clear, unequivocal and convincing evidence; I further hold that the seller has failed to sustain his claim that the purchaser did not intend to pay for the merchandise at the time it was purchased; I further hold that under all the facts and circumstances of the case and the reasonable inferences to be drawn from the evidence that the two agreements, supra, constituted a preference under the bankruptcy law and are void as to other creditors.

Since only the sum of approximately $512 is involved in this controversy I will treat this opinion as findings of fact and conclusions of law and the clerk will enter judgment holding generally in favor of the Trustee and against the seller.